## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| BIOVANT, LLC, | ) | |
| *doing business as* BIOVANTE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 4:24-cv-00106-SEP |
| | ) | |
| DUSTIN WASSENAAR AND | ) | |
| WASSENAAR AG SUPPLY, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

Before the Court is Plaintiff's Motion for Temporary Restraining Order, Doc. [4].  The Court held a hearing on the motion on February 2, 2024.  For the reasons set forth below, the Motion for a Temporary Restraining Order is granted in part.

### FACTS AND BACKGROUND

In 2018, Defendant Dustin Wassenaar, a Minnesota farmer, discovered Plaintiff Biovante on YouTube and bought some of its products for use on his farm.  Doc. [27-1] ¶ 1.  Because he thought the products worked well, Wassenaar began selling Biovante products to supplement his farming income.  *Id.* ¶ 2.  Biovante's CEO, Chris Masters, connected Wassenaar to a local Biovante dealer, SGI Ag Services, LLC.  *Id.* ¶ 1.  SGI sold Biovante products to Wassenaar, which he then sold through his company, Defendant Wassenaar Ag Supply, LLC.  *Id.* ¶ 4.  While Wassenaar never directly worked for Biovante, he was held out to the public as a Biovante team member.  Doc. [28-1] at 8.  Biovante listed Wassenaar as a "dealer" on its website and referred him sales leads for customers who inquired on Biovante's website.  *Id.* at 3; Doc. [29].  Biovante also paid for him to represent Biovante at agricultural trade shows.  Doc. [28-1] at 4, 18-19.

In August of 2022, Wassenaar attended a Biovante team meeting in Branson, Missouri.  At that meeting, Biovante's leadership planned to present confidential business information about some of Biovante's products and business strategies.  Doc. [28-1] ¶¶ 11-12.  Wassenaar signed an "Agreement for Confidentiality" so that he could attend the confidential meeting.  Doc. [1-1].  The Agreement included a non-compete clause that prohibited Wassenaar from soliciting or promoting products for Biovante's competitors.  After that meeting, Wassenaar continued to sell Biovante's products until September 16, 2023, when Wassenaar ended his relationship with

Biovante and began selling similar products for one of Biovante's competitors, BioTech Innovations.  Doc. [27-1] ¶¶ 21-22.

On January 19, 2024, Plaintiff filed a Motion for Temporary Restraining Order to stop Defendants from selling BioTech products.  *See* Doc. [4].  On January 23, 2024, Plaintiff filed a Notice Requesting Hearing on Motion for Temporary Restraining Order, requesting a hearing by January 30, 2024.  *Id.*  Defendants' counsel entered appearances on January 26, 2024.  The Court set a briefing schedule and held a motion hearing on February 2, 2024, after which it took the parties' arguments under advisement and, on February 3, 2024, issued an order granting Plaintiff's motion in part.  *See* Doc. [32].  This Memorandum and Order follows to set forth the reasons for the Court's ruling.

## LEGAL STANDARD

When considering whether to issue injunctive relief, the Court evaluates:  (1) the threat of irreparable harm to the movant; (2) the balance of that harm against the injury that granting the injunction will inflict on other parties; (3) the probability that movant will succeed on the merits; and (4) the public interest.  *See Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109 (8th Cir. 1981) (en banc).  "While 'no single factor is determinative,' the probability of success factor is the most significant."  *Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013) (quoting *Dataphase*, 640 F.2d at 113) (internal citation omitted).

## DISCUSSION

## I.    Biovante demonstrated a likelihood of success on the merits of Count II.[1]

When seeking to enjoin private action, a movant must establish that he has a "fair chance of prevailing."  *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008).  A "fair chance" is not easily defined, and the Eighth Circuit has cautioned that "an effort to apply the probability language to all cases with mathematical precision is misplaced."  *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981).  But "where the balance of other factors tips decidedly toward plaintiff a preliminary injunction may issue if movant has raised questions so serious and difficult as to call for more deliberate investigation."  *Rounds*, 530 F.3d at 731 (quoting *Dataphase*, 640 F.2d at 113).

---

[1] In Count II for Breach of Contract, Biovante alleges that Wassenaar breached the Agreement by soliciting the business of Biovante customers "in an effort to cause such customers to instead do business with BioTech."  Doc. [1] ¶ 55.

Here, the balance of the other factors (which largely depend on the probability of success on the merits) does decidedly tip toward Biovante, and Biovante has raised "questions so serious and difficult as to call for more deliberate investigation" into whether Defendants' conduct compromises its legitimate business interests in certain customer contacts in violation of a valid and enforceable non-compete agreement. *Dataphase*, 640 F.2d at 113. Based on the Court's understanding of Missouri non-compete case law at this juncture, Biovante has not produced sufficient evidence to raise serious questions as to whether it has a protectable interest in *all* current and prospective consumers of such products, *everywhere* in the country, whether or not they have ever purchased or expressed interest in purchasing products from Biovante. And it has not provided enough evidence to raise serious questions as to whether Wassenaar is unfairly competing with Biovante by using its protectable trade secrets. Therefore, the Court is granting Biovante a temporary restraining order only against Defendants' solicitation or promotion of products in the categories of seed treatments, soil amendments, and foliar products to any individual or entity Defendants knew on or before September 16, 2023, to be a Biovante customer or prospective customer.[2]

### A. There is sufficient evidence that the non-compete agreement is a valid contract.

Wassenaar argues that the Agreement he signed at the Branson Biovante meeting is invalid because Biovante gave no consideration for Wassenaar's promise not to compete. *See* Doc. [27] at 8-10. "Consideration 'consists either of a promise (to do or refrain from doing something) or the transfer or giving up of something of value to the other party.'" *Baker v. Bristol Care, Inc.*, 450 S.W.3d 770, 774 (Mo. 2014) (quoting *Morrow v. Hallmark Cards, Inc.*, 273 S.W.3d 15, 25 (Mo. Ct. App. 2008)). Missouri courts do not scrutinize the mutuality of the parties' obligations. "As long as the requirement of consideration is met, mutuality of obligation is present, even if one party is more obligated than the other." *State ex rel. Vincent v. Schneider*, 194 S.W.3d 853, 859 (Mo. 2006) (quoting *Harris v. Green Tree Fin. Corp.*, 183 F.3d 173, 181 (3d Cir. 1999)).

Biovante offered Wassenaar the chance to attend the team meeting and hear what Plaintiff regarded as sensitive information about its products. Wassenaar was not entitled to stay

---

[2] Missouri law allows a district court to give overly broad provisions of a non-compete agreement only partial effect. *See N.I.S. Corp. v. Swindle*, 724 F.2d 707, 710 n.2 (8th Cir. 1984) (citing *Orchard Container Corp. v. Orchard*, 601 S.W.2d 299, 304 (Mo. Ct. App. 1980)).

at the meeting, and Biovante could have required him to leave.  In exchange for the ability to stay, Wassenaar made promises to safeguard Biovante's confidential information and not to compete with Biovante for two years after the termination of the Agreement.  Doc. [1-1].  Defendants argue that the right to stay at the meeting should not count as consideration, but they do not deny that Wassenaar signed the Agreement in exchange for being permitted to stay.  Thus, their argument goes to sufficiency or equivalency of consideration, which Missouri law admonishes courts not to consider.  *See Schneider*, 194 S.W.3d at 859.  Thus, the Court finds that Plaintiff has at least a fair chance of prevailing on the question of the validity of the August 11, 2022, Agreement.

### B.  Missouri law allows enforcement of non-compete agreements to protect trade secret and customer contacts.

In Missouri, "courts generally enforce a non-compete agreement if it is demonstratively reasonable.  'A non-compete agreement is reasonable if it is no more restrictive than is necessary to protect the legitimate interests of the employer.'"  *Whelan Sec. Co. v. Kennebrew*, 379 S.W.3d 835, 841 (Mo. 2012) (citations omitted) (quoting *Healthcare Servs. of the Ozarks, Inc. v. Copeland*, 198 S.W.3d 604, 610 (Mo. 2006)).  "[A] non-compete agreement is enforceable 'only to the extent that the restrictions protect the employer's trade secrets or customer contacts.'"  *Id*. at 842 (quoting *Copeland*, 198 S.W.3d at 610).  "The employer has the burden to prove that the non-compete agreement protects its legitimate interests in trade secrets or customer contacts and that the agreement is reasonable as to time and geographic space."  *Id*.

### C.  Biovante demonstrated a fair chance of prevailing on the customer-contacts aspect of its claim.

Biovante presented enough evidence to raise serious and difficult questions about its protected interest in customer goodwill.  "'Customer contacts' has been defined as 'essentially the influence an employee acquires over his employer's customers through personal contact.'"  *Copeland*, 198 S.W.3d at 611 (quoting S*chmersahl, Treloar & Co., P.C. v. McHugh*, 28 S.W.3d 345, 349 (Mo. Ct. App. 2000)).  One protectable aspect of customer contacts is the customer's goodwill.  *See*, *e.g*., *Osage Glass, Inc. v. Donovan*, 693 S.W.2d 71, 74 (Mo. 1985) ("Covenants against competition must serve a proper interest of the employer in protecting the good will of a business . . . .")  "The goodwill that develops results in sales of the company's product or services.  Therefore, an employer has a protectable right in both customers and goodwill."  *AEE-EMF, Inc. v. Passmore*, 906 S.W.2d 714, 720 (Mo. Ct. App. 1995).

When the company and salesperson are in a traditional employer-employee relationship, the question is easy. Missouri courts explain that the "goodwill that develops from customer contacts between the salesman or business partner and the company's customer is essential to the companies' success *and is the reason the employee or the business partner is remunerated*." *Id.* (emphasis added); *see also Naegele v. Biomedical Sys. Corp.*, 272 S.W.3d 385, 389 (Mo. Ct. App. 2008) ("[C]ustomer relationships are pursued and developed *at the employer's expense*, and add value to the employer's business. This is true regardless of whether the customer contact originated with the employer or the employee.") (emphasis added).

But Dustin Wassenaar's relationship with Biovante was not straightforward. There is evidence that Biovante and Wassenaar considered Wassenaar to be part of the "Biovante team." Wassenaar referred to himself as part of the "Biovante team" and considered himself a Biovante dealer, Doc. [28-1] at 10-16; he was featured on Biovante's website, *id.* at 8; he represented Biovante at trade shows, at Biovante's behest and with at least some of his expenses paid by Biovante. *Id.* at 4. But most of the hallmarks of a traditional employment relationship were missing. Wassenaar did not have an employment contract with Biovante. Wassenaar did not even have a buy/sell agreement with Biovante; Wassenaar contracted with a third party, SGI. That contract did mention Biovante, and at oral argument, Biovante claimed to have exercised significant influence over that contract's terms, including the margins that Mr. Wassenaar received from sales of Biovante products and the boundaries of his sales territory, but there is no evidence of that in the record. Thus, the evidence before the Court at this time does not present a clear picture of Wassenaar's relationship to Biovante and how similar or dissimilar it was to that of an employee.

Missouri law does not provide a clear answer to the enforceability of a non-compete in a non-standard employment relationship, but it does allow for the protection of consumer contacts from misuse by entities other than just an employee. *See, e.g.*, *AEE-EMF, Inc.*, 906 S.W.2d at 720 (a salesman or *business partner*'s ability to generate customer goodwill "is the reason the employee *or the business partner* is remunerated") (emphasis added). And Missouri authorities suggest that a company's protectable interest in its customer is in some way tied to the expense that the company puts into cultivating the customer relationship. *See Naegele*, 272 S.W.3d at 389 ("[C]ustomer relationships are pursued and developed *at the employer's expense* . . . ."). Here, Biovante did not pay Wassenaar a regular salary, benefits, or a commission on sales.

Wassenaar covered his own costs and accepted substantially greater risk than a typical employee would.  Wassenaar did earn money by selling Biovante products, but that money did not come directly from Biovante.  Biovante's choice to contract with distributors and dealers instead of hiring employees had certain benefits—e.g., lower overhead and operating expenses, less infrastructure, less risk—but also certain costs—e.g., a portion of profits going to distributors and dealers and exercising less control over how products are marketed and sold.  The question currently before the Court is whether the costs of Biovante's business model include losing the protectable interest it might otherwise have claimed in Wassenaar's customer contacts.

Under Missouri law, a company does not automatically have a protectable interest in any customer that buys its product.  But it "is entitled to utilize non-compete agreements to protect itself from *unfair competition* by misuse of . . . .the employee's customers contacts *developed at its expense*."  *Copeland*, 198 S.W.3d at 611 (emphasis added).  Biovante did not provide evidence that every one of Wassenaar's customer relationships was developed at its expense.  But there is evidence in the record that Biovante materially contributed to Wassenaar's development of his customer relationships.  Wassenaar sold no agricultural products before selling Biovante's.  Doc. [27-1] ¶¶ 1-4.  He told Biovante's CEO that "taking on the Biovante dealership has given our family some new opportunities."  Doc. [28-1] at 10.  Biovante paid for Wassenaar to attend Biovante company meetings in other states, *id*. ¶ 10, and Biovante provided Wassenaar with training and education about its products, some of which Biovante considered to be sensitive enough to ensure that everyone in the room had signed confidentiality agreements, *id*. ¶ 12.  Biovante also provided Wassenaar with customer leads after potential customers inquired on its website, where it held Wassenaar out to the public as an authorized dealer of Biovante products.  *See id*. ¶ 7; *id*. at 8; Doc. [29].  And Biovante provided Wassenaar with financial support in cultivating Biovante customers at events like trade shows.  Doc. [28-1] ¶¶ 8-9; *id*. at 18-19.

The record casts doubt on Wassenaar's characterization of his relationship with Biovante.  *See, e.g.*, Doc. [27-1] ¶ 4 ("We received no support, through financing, product, or customer contacts, from Biovante."); *id*. ¶ 7 (I have never been . . . a Biovante 'dealer representative.'  I do not even know what the phrase 'dealer representative,' as used in Biovante's Complaint, means.").  Wassenaar apparently benefited from Biovante's help as he built his business and customer base.  Neither party has pointed to Missouri case law clearly delineating how much

support—financial or otherwise—a company must give to a business partner to secure a protected interest in the business partner's customers. But Biovante has shown that it is close enough to the line to temporarily restrain Wassenaar from poaching its protected customer contacts while the Court engages in "more deliberate investigation." *Dataphase*, 640 F.2d at 113.

### D. Biovante did not substantiate its asserted interest in trade secrets.

Biovante did not meet its burden to show that the Agreement protected a legitimate interest in its trade secrets. "Evidence of purported 'trade secrets' must be more than general assertions, but must be sufficiently specific to allow a determination by the court." *Mo-Kan Cent. Recovery Co. v. Hedenkamp*, 671 S.W.2d 396, 400 (Mo. Ct. App. 1984). Biovante did not provide evidence beyond general assertions to show that Wassenaar received protected trade secrets. The evidence Biovante provided includes (1) a certified complaint; and (2) a declaration by Biovante CEO Chris Masters. In the Complaint, Biovante alleges:

> 24. Throughout his dealer relationship with Biovante, Wassenaar had access to, knowledge of, and familiarity with Biovante's confidential information and trade secrets as set forth above. In addition, Wassenaar used the confidential information and trade secrets as part of his professional dealer relationship with Biovante.

> 25. As a dealer for Biovante, Wassenaar serviced Biovante's sales representatives during which Wassenaar gained access to Biovante's customer lists and customer information along with said sales representatives' customer lists and information.

Doc. [1] ¶¶ 24-25. "[A]s set forth above" seems to refer to the description of "confidential information" in the Agreement between Biovante and Wassenaar. *See id.* ¶ 20. That description lists dozens of types of information that might be considered trade secrets but does not explain with any specificity the information that Biovante actually gave to Wassenaar.

Mr. Masters's declaration provides some more detail. Mr. Masters states that during a 2022 company meeting that was not open to the public,

> I presented confidential information to the Biovante team in attendance, including Wassenaar. The confidential and business competition sensitive information I shared at the meeting including company plans and strategy for the development of proprietary microbial testing and data collection methodologies to be used in a proprietary analytical software tool based on a proprietary algorithm that was then in the early stages of development, as a strategy to improve product performance and customer service and satisfaction.

Doc. [28-1] ¶ 12.  That description is more specific than what is in the verified Complaint.  But describing "microbial testing," "data collection methodologies," an "analytical software tool," and an "algorithm" as "proprietary" is still a general assertion, and it does not allow the Court to decide whether those things are trade secrets.  Biovante did not provide enough evidence going to the factors Missouri courts consider in deciding whether something is a trade secret:

> (1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Copeland*, 198 S.W.3d at 611.

Biovante could have presented more evidence to rebut Wassenaar's claim that he never received any trade secret or confidential information at the 2022 meeting.  *See* Doc. [27-1] ¶ 16.  To protect the confidentiality of the information, Biovante could have moved for leave to file it under seal.  *See* E.D. Mo. L.R. 13.05.  Without information that allows the Court to determine whether Wassenaar received trade secret information, the Court will not restrain Wassenaar from using any information that could fall under the Agreement's broad description of "confidential information."

**E.  The Agreement's lack of geographic scope is addressed by the scope of the TRO.**

Non-compete agreements that protect legitimate business interests from unfair competition must also be "narrowly tailored temporally and geographically."  *Whelan*, 379 S.W.3d at 841-42.  The Agreement between the parties has no geographic limitation.  *See* Doc. [1-1] ¶ 8.  Biovante argued at the TRO hearing that the unlimited scope was necessary to prevent Wassenaar from unfairly profiting from Biovante's trade secrets.  But, as discussed above, Biovante has not sufficiently shown that any of the information provided to Wassenaar qualified as a protectable trade secret.  Therefore, there is no justification for a non-compete with unlimited geographic scope.  On the record before the Court at this time, restraining Wassenaar from contacting or soliciting new customers *anywhere* in the world would not be narrowly tailored to protect a legitimate business interest.

Limiting the restraining order to the Biovante customers and prospective customers that Wassenaar knew about before he ended his affiliation with Biovante appropriately limits the

scope of the "class with whom contact is limited" for the purposes of this stage of the litigation. *Sigma-Aldrich Corp. v. Vikin*, 451 S.W.3d 767, 773 (Mo. Ct. App. 2014). That scope protects the "delicate balance of practical business considerations" by protecting the employer without punishing the employee. *Copeland*, 198 S.W.3d at 611; *see also Superior Gearbox Co., v. Edwards*, 869 S.W.2d 239, 247 (Mo. Ct. App. 1993) ("Protection of the employer, not punishment of the employee, is the essence of the law."). Going forward, Biovante will need to produce evidence to justify the geographic scope of any restraint it wants the Court to enforce.

## II.    **Biovante faces a threat of irreparable harm.**

"It is well established that '[i]rreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Grasso Enters., LLC v. Express Scripts, Inc.*, 809 F.3d 1033, 1040 (8th Cir. 2016) (quoting *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009)). Under Missouri law, when a valid non-compete agreement is violated, courts generally find that an irreparable injury has been shown. *See N.I.S. Corp. v. Swindle*, 724 F.2d 707, 710 (8th Cir. 1984). At the TRO hearing, Defendants' counsel agreed that Missouri law includes a general presumption in favor of finding irreparable harm for violation of an enforceable non-compete agreement.

The evidence supports that presumption. Wassenaar acknowledges that he is now buying "biological products directly from Mr. Ma and his company, BioTech Innovations" and that he has "continued selling agricultural products to the same customers [he] always [has]." Doc. [27-1] ¶¶ 21-22. Without injunctive relief, Biovante is left "with the Hobson's choice of either filing a separate lawsuit for damages (or at least an amendment to an initial suit) each time [Wassenaar] solicited away another [Biovante] customer or waiting until [Biovante's] customers and goodwill had been completely drained away." *N.I.S. Corp.*, 724 F.2d at 710. Therefore, this factor tips in Biovante's favor.

## III.    **The balance of harms and public interest factors favor Biovante.**

The balance of harms leans in Biovante's favor. Missouri law protects a company's legitimate interests in customer contacts. Because Biovante made a sufficient showing that that the non-compete is at least partially enforceable, it will suffer irreparable harm by losing customers to Wassenaar. Wassenaar, on the other hand, admits to signing the Agreement, which included terms far more expansive than the restraints in the Court's Order. Having signed the

Agreement, Wassenaar's harm—to the extent the enforcement of a valid contract is a harm—should have been foreseeable.  And the harm to Wassenaar is mitigated by the fact that he can still sell other agricultural products, even to his former Biovante customers.  The TRO also does not restrain Wassenaar from selling any products to individuals or entities he did not know on or before September 16, 2023, to be Biovante customers or prospective customers.  And if it is later determined that Wassenaar was wrongfully enjoined, his harms will be compensable by the bond the Court will require of Biovante.

For similar reasons, the TRO serves the public interest.  While the law generally disfavors restraints on competition, Missouri courts have recognized that "public policy approves employment contracts containing restrictive covenants because the employer has a proprietary right in its stock of customers and their good will."  *Schott v. Beussink*, 950 S.W.2d 621, 625 (Mo. Ct. App. 1997).  Unfair competition is not in the public interest, and the TRO protects only those customer contacts Biovante has made some showing that it would be unfair to allow Wassenaar to lure away.

CONCLUSION

Biovante has made a sufficient showing that "the balance of equities," as set out in the *Dataphase* factors, "requires the court to intervene to preserve the status quo until the merits are determined."  *Dataphase*, 640 F.2d at 113 (footnote omitted).  To minimize any harm to the Wassenaar, the restraints are limited to the minimum necessary to protect those interests in customer contacts as to which Biovante has shown a "fair chance of prevailing."  *Rounds*, 530 F.3d at 732.  The preliminary injunction hearing, set for 13 days after entry of the TRO, will provide an opportunity for "more deliberate investigation" of these issues in the very near term.  *Dataphase*, 640 F.2d at 113.

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff's Motion for Temporary Restraining Order, Doc. [4], is **GRANTED IN PART.**

**IT IS FURTHER ORDERED** that Defendants Dustin Wassenaar and Wassenaar AG Supply, LLC, are **RESTRAINED** and **ENJOINED** from soliciting or promoting products in the categories of seed treatments, soil amendments, and foliar products to any individual or entity Defendants knew on or before September 16, 2023, to be a Biovante customer or prospective customer.  For purposes of this Order, a "Biovante customer" is any individual or business entity

that has purchased Biovante products in the past, whether from Defendants or any other Biovante dealer.  A "prospective customer" is any individual or business entity that has expressed interest in purchasing Biovante products.  This restraining order does not prevent Defendants from selling products other than seed treatments, soil amendments, and foliar products to any customer.  It also does not restrain Defendants from selling any products to individuals or entities they did not know on or before September 16, 2023, to be Biovante customers or prospective customers.

     **IT IS FURTHER ORDERED** that this injunction will remain in effect until **Friday, February 16, 2024, at 5:00 p.m.**

     **IT IS FURTHER ORDERED** that a preliminary injunction hearing is set for **Friday, February 16, 2024, at 11:00 a.m.**, in the courtroom of the undersigned.

     **IT IS FURTHER ORDERED** that the parties will each file a brief, no longer than two pages, on the proper amount of a bond to cover the costs and damages that will be sustained by Defendants during the time covered by this Temporary Restraining Order if they are found to have been wrongly enjoined, **no later than Monday, February 5, 2024, at 5:00 p.m.**  *See* Fed. R. Civ. P. 65(c).

     **IT IS FINALLY ORDERED** that the parties will meet and confer and file on the docket **no later than Wednesday, February 7, 2024**, a proposed schedule for limited discovery, if necessary, and briefing of a motion for a preliminary injunction.  Briefing of any such motion must be complete **no later than Wednesday, February 14, 2024, at 5:00 p.m.**

     Dated this 5th day of February, 2024.

_____
SARAH E. PITLYK
UNITED STATES DISTRICT JUDGE