**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| BIOVANT, LLC,<br>*doing business as* BIOVANTE,<br><br>Plaintiff,<br>v.<br><br>DUSTIN WASSENAAR AND<br>WASSENAAR AG SUPPLY, LLC,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 4:24-cv-00106-SEP |

**MEMORANDUM AND ORDER**

Before the Court is Plaintiff's Motion for Preliminary Injunction, Doc. [46]. The Court held a hearing on the motion on March 1, 2024. For the reasons set forth below, the motion is denied.

**FACTS AND BACKGROUND**[1]

In 2018, Defendant Dustin Wassenaar, a Minnesota farmer, discovered Plaintiff Biovante on YouTube and bought some of its products for use on his farm. Doc. [27-1] ¶ 1. Because he thought the products worked well, Wassenaar began selling Biovante products to supplement his farming income. *Id.* ¶ 2. Biovante's CEO, Chris Masters, connected Wassenaar to a local Biovante distributor, SGI Ag Services, LLC. *Id.* ¶ 1. SGI sold Biovante products to Wassenaar, which he then sold through his company, Defendant Wassenaar Ag Supply, LLC.[2] *Id.* ¶ 4. Wassenaar never directly worked for Biovante, but he considered himself part of the Biovante "organization," was held out to the public as a Biovante dealer, and received some support from Biovante. Doc. [28-1] ¶¶ 2-8. In August of 2022, Wassenaar attended a Biovante meeting in Branson, Missouri. The meeting was not open to the public, and only a select group of individuals affiliated with Biovante were invited. *Id.* ¶¶ 11-12. Biovante planned to present information to the group that Biovante alleges included trade secrets, so it gave Wassenaar an

[1] The Court makes findings of fact based on the record from (1) the parties' briefing on the Motion for a Temporary Restraining Order, Docs. [1], [4], [6], [12], [27], [28], [29]; (2) the parties' briefing on the Motion for Preliminary Injunction, Docs. [46], [48], [50], [51], [60]; and (3) the evidence presented at the preliminary injunction hearing, Docs. [57], [58], [59].

[2] The Court refers to Defendants Dustin Wassenaar and Wassenaar Ag Supply, LLC, collectively as "Wassenaar."

"Agreement for Confidentiality." Wassenaar signed the agreement, which required him to "refrain from soliciting, promoting, or becoming a representative for a biologically minded company that would directly compete with Biovante in the line of seed treatments, soil amendments, and/or foliar products, for a period of two (2) years." Doc. [1-1] ¶ 8.

Wassenaar continued to sell Biovante products in 2022 and 2023 under a "Dealer Agreement" with SGI Ag Services. *See* Doc. [48-23]. In the late summer of 2023, the parties discussed the possibility of Wassenaar becoming a distributor of Biovante products. *See* Doc. [50-19]. As a distributor, Wassenaar would have contracted directly with Biovante—instead of SGI—to sell Biovante products. Around the same time, the relationship between Biovante and its business partner BTI AG LLC fell apart. *See* Doc. [50-11] at 13. That split is the subject of another suit, *Biovant LLC v. BTI AG LLC*, No. 3:23-cv-01525-X (N.D. Tex. filed July 7, 2023). *See* Doc. [27-2]. Mark Ma, the head of BTI and former business partner of Mr. Masters, started a new company, BioTech Innovations, that directly competes with Biovante. *See id*. When Wassenaar's Dealer Agreement with SGI expired on September 30, 2023, Wassenaar started selling BioTech products instead of becoming a Biovante distributor or signing a new dealer agreement with SGI. *See* Doc. [27-1] ¶ 21.

On January 19, 2024, Biovante filed a Motion for a Temporary Restraining Order to stop Wassenaar from selling BioTech products. *See* Doc. [4]. On January 23, 2024, Plaintiff filed a Notice Requesting Hearing on Motion for Temporary Restraining Order, requesting a hearing by January 30, 2024. *See* Doc. [9]. Defendants' counsel entered appearances on January 26, 2024. The Court held a motion hearing on February 2, 2024, after which it took the parties' arguments under advisement and, on February 3, 2024, issued an order restraining Wassenaar for 14 days from soliciting or promoting products in the categories of seed treatments, soil amendments, and foliar products to any individual or entity Wassenaar knew on or before September 16, 2023, to be a Biovante customer or prospective customer. *See* Doc. [32]. The Court set a preliminary injunction hearing for February 16th, the end of the TRO period. *See* Doc. [33]. The parties jointly moved to continue the hearing to March 1st and extend the TRO until that date. *See* Doc. [37]. The Court granted the motion and agreed to the parties' proposed briefing schedule. *See* Doc. [38]. Biovante filed its brief on February 26th, and Wassenaar filed a response in opposition on February 27th. *See* Docs. [46], [48]. The response included 28 exhibits, many of

them containing evidence that was not before that Court at the TRO stage. Biovante filed its reply on February 28th. *See* Doc. [51]. Neither of Biovante's briefs included any new evidence.

At the March 1st hearing, the parties presented testimony from Chris Masters and Dustin Wassenaar, and Biovante submitted 11 exhibits. *See* Docs. [58], [59]. After considering the evidence presented at the hearing and reviewing the evidence Defendants attached to their response, the Court denied Biovante's Motion for Preliminary Injunction and allowed the TRO to expire. *See* Doc. [57]. This Memorandum and Order sets forth the Court's reasoning for that decision.

**LEGAL STANDARD**

When considering whether to issue injunctive relief, the Court evaluates: (1) "the threat of irreparable harm to the movant," (2) "the likelihood that the movant will succeed on the merits," (3) "the balance between the harm to the movant and injury that an injunction would inflict on other parties," and (4) "the public interest." *Parents Defending Educ. v. Linn Mar Cmty. Sch. Dist.*, 83 F.4th 658, 668 (8th Cir. 2023) (citing *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc)). "While 'no single factor is determinative,' the probability of success factor is the most significant." *Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013) (citation omitted) (quoting *Dataphase*, 640 F.2d at 113).

**DISCUSSION**

On the record before the Court at the TRO stage of the case, the balance of the *Dataphase* factors favored Biovante. *See* Doc. [33]. Now the Court must re-evaluate the parties' arguments and consider any new evidence presented at the preliminary injunction stage. Upon consideration of the new evidence presented, and with the benefit of more thorough briefing on the law, the Court finds that the balance of the factors has changed. On the current record, Biovante has not satisfied its "burden of establishing the necessity of [injunctive relief]." *Lindell v. United States*, 82 F.4th 614, 618 (8th Cir. 2023) (citing *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 316 (8th Cir. 2009)).

**I. Biovante has not shown a fair chance of prevailing on Count II.**[3]

When seeking to enjoin private action, a movant must establish that he has a "fair chance of prevailing." *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732 (8th Cir.

[3] In Count II, for breach of contract, Biovante alleges that Wassenaar became a BioTech sales representative and solicited Biovante customers in violation of the "Agreement for Confidentiality" that

2008) (en banc). A "fair chance" is not easily defined, and the Eighth Circuit has cautioned that "an effort to apply the probability language to all cases with mathematical precision is misplaced." *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc). But "where the balance of other factors tips decidedly toward plaintiff a preliminary injunction may issue if movant has raised questions so serious and difficult as to call for more deliberate investigation." *Rounds*, 530 F.3d at 731 (quoting *Dataphase*, 640 F.2d at 113).

In its TRO Order, the Court explained:

> Based on the Court's understanding of Missouri non-compete case law at this juncture, Biovante has not produced sufficient evidence to raise serious questions as to whether it has a protectable interest in *all* current and prospective consumers of such products, *everywhere* in the country, whether or not they have ever purchased or expressed interest in purchasing products from Biovante. And it has not provided enough evidence to raise serious questions as to whether Wassenaar is unfairly competing with Biovante by using its protectable trade secrets. Therefore, the Court is granting Biovante a temporary restraining order only against Defendants' solicitation or promotion of products in the categories of seed treatments, soil amendments, and foliar products to any individual or entity Defendants knew on or before September 16, 2023, to be a Biovante customer or prospective customer.

Doc. [33] at 3. Thus, the Court granted a limited injunction based on evidence presented at the TRO hearing suggesting that Biovante had a protectable interest in the customers who have bought Biovante products from Wassenaar, even though the Court found that "Biovante did not substantiate its asserted interest in trade secrets." Doc. [33] at 7. With the benefit of a month to conduct discovery, Biovante still has not substantiated its asserted interest in trade secrets. Moreover, on an expanded record, the Court no longer believes that Biovante has a fair chance of prevailing on the customer contacts component of its claim.

**A. Missouri law allows enforcement of non-compete agreements to protect trade secrets and customer contacts.**

In Missouri, "courts generally enforce a non-compete agreement if it is demonstratively reasonable. 'A non-compete agreement is reasonable if it is no more restrictive than is necessary to protect the legitimate interests of the employer.'" *Whelan Sec. Co. v. Kennebrew*, 379 S.W.3d 835, 841 (Mo. 2012) (citations omitted) (quoting *Healthcare Servs. of the Ozarks, Inc. v. Copeland*, 198 S.W.3d 604, 610 (Mo. 2006)). "[A] non-compete agreement is enforceable 'only

---

Wassenaar signed at the 2022 Branson meeting. Doc. [1] ¶¶ 54-56. Count III, for tortious interference with business expectancies, depends on the enforceability of the same contract, and therefore Biovante's chances of prevailing on Count III depend upon its chances of prevailing on Count II.

to the extent that the restrictions protect the employer's trade secrets or customer contacts.'" *Id*. at 842 (quoting *Copeland*, 198 S.W.3d at 610). "The employer has the burden to prove that the non-compete agreement protects its legitimate interests in trade secrets or customer contacts and that the agreement is reasonable as to time and geographic space." *Id*.

**B. The "Agreement for Confidentiality" is a questionable basis for an ancillary restraint of trade.**

"An agreement by a person to refrain from exercising his trade or calling, standing alone, is viewed as being illegal and contrary to public policy . . . ." *Renal Treatment Centers-Mo., Inc. v. Braxton*, 945 S.W.2d 557, 563 (Mo. Ct. App. 1997). But "if a covenant not to compete forms part of a legitimate transaction, a different problem is presented." *Id*. When a promise not to compete is attached to a legitimate transaction, it is known as an "ancillary restraint." *See* Restatement (Second) of Contracts § 188 (Am. L. Inst. 1981). "Such legitimate transactions or relationships include employment contracts, buy-sell contracts, partnership agreements, and independent contractor agreements," as well as a "shareholder agreements in close corporations" and an "operating agreement between a limited liability company and its members." *JTL Consulting, L.L.C. v. Shanahan*, 190 S.W.3d 389, 396-97 (Mo. Ct. App. 2006) (collecting cases); *see also Mayer Hoffman McCann, P.C. v. Barton*, 614 F.3d 893, 905 (8th Cir. 2010). But that list is not exhaustive; "there may be other situations in which a valid transaction or relationship would give a promisee legitimate interest sufficient to sustain a promise not to compete." *JTL*, 190 S.W.3d at 396 (cleaned up) (quoting *Renal Treatment*, 945 S.W.2d at 563).

The only contract between Biovante and Wassenaar is the "Agreement for Confidentiality." On its face, that agreement does not create any kind of enduring relationship between the parties. The agreement frames the parties' relationship like this:

> *WHEREAS*, Biovante is/operates a business of manufacturing, distributing and selling high quality, environmentally friendly agricultural products for seed, soil and plants, and is interested in engaging new sales Representatives to assist selling its products; and,
>
> *WHEREAS*, Representative is a representative selling products in the line of business and for companies in competition with Biovante and,
>
> *WHEREAS*, the interest of both Representative and Biovante may be served by Representative selling for Biovante[.]

Doc. [1-1] at 1. The agreement is not an employment contract. It is not a partnership agreement. It sets out the parties' obligations while they explored the *possibility* of Wassenaar selling

products for Biovante. The agreement does not obligate Biovante to do anything; it just states that "(a) while exploring a future professional relationship with Biovante [Wassenaar] may become privy to the identity of Biovante's business associates, contacts and relationships and (b) [Wassenaar] may further become privy to 'Confidential Information' of Biovante."[4] *Id.* ¶ 3. By comparison, the agreement obligates Wassenaar to do a great deal. Notably, Wassenaar agreed to "refrain from soliciting, promoting, or becoming a representative for a biologically minded company that would directly compete with Biovante in the line of seed treatments, soil amendments, and/or foliar products, for a period of two (2) years."[5] *Id.* ¶ 8.

It is by no means obvious that the "Agreement for Confidentiality" can support an ancillary covenant not to compete under Missouri law. The parties have not cited, and the Court is not aware of, any Missouri case law addressing an ancillary restraint in such a contract. The transactions supporting an ancillary restraint typically create some kind of ongoing relationship between the parties—e.g., employer and employee; buyer and seller; partnership; membership in an LLC; or, at a minimum, a principal and agent relationship—in which the promisor will be acting on the promisee's behalf. The employee acts on behalf of the employer; the member of an LLC acts on behalf of the LLC; the partner acts on behalf of the partnership. An employer can prevent an employee from using the trade secrets the employee learns because the employee had access to the trade secrets while acting on the employer's behalf. And a business partnership can

---

[4] The fact that the terms of the "Agreement for Confidentiality" do not contain any consideration from Biovante raises a question about the contract's validity. Wassenaar raised that argument at the TRO stage, but the Court found that Biovante "has at least a fair chance of prevailing on the question of the validity of the August 11, 2022, Agreement." *See* Doc. [33] at 4. "Wassenaar was not entitled to stay at the [Branson] meeting, and Biovante could have required him to leave. In exchange for the ability to stay, Wassenaar made promises to safeguard Biovante's confidential information and not to compete with Biovante for two years after the termination of the Agreement." *Id.* at 3-4.

[5] While Missouri courts will not inquire into the sufficiency of consideration when deciding the overall validity of a contract, they do look at the sufficiency of consideration when deciding whether to enforce a promise not to compete. *See Sturgis Equip. Co. v. Falcon Indus. Sales Co.*, 930 S.W.2d 14, 17 (Mo. Ct. App. 1996) ("[A]n examination of the consideration supporting the restraint reveals insufficient consideration to support the non-compete clause."). That inquiry is consistent with the principle that a restrictive covenant can protect only legitimate interests. When a party gives only meager consideration for a promise not to compete, it is evidence that the restriction is a bare restraint of trade, not ancillary to a legitimate transaction. *See Alltype Fire Prot. Co. v. Mayfield*, 88 S.W.3d 120, 123-24 (Mo. Ct. App. 2002) ("The essence of the holding [in *Sturgis*] is that the evidence did not support a finding of knowledge of trade secrets or of customer contact sufficient to support a restrictive covenant, and so did not justify any kind of restriction.").

restrain a former partner from soliciting the away customers because the partner fostered those customer relationships on behalf of the partnership.

The "Agreement for Confidentiality" does not appear to create an ongoing relationship between Biovante and Wassenaar along the same lines as any of the above. And there is very little evidence of such a relationship in the record. Notably, Wassenaar did not have to sign any sort of contract with Biovante, even the "Agreement for Confidentiality," *before* selling Biovante products. As noted above, all of his contractual and transactional dealings were with SGI, not Biovante. And it appears that, even if Wassenaar had not attended the Branson meeting, he would still have been able to sell Biovante products to existing customers and cultivate new ones. Thus, it is unclear what "legitimate transaction[] or relationship[]" existed between these two parties to support a valid ancillary restraint. *JTL*, 190 S.W.3d at 397.

At this preliminary stage in the case, the Court is not yet in a position to decide whether the "Agreement for Confidentiality" can support its restrictive covenants. But the fact that Biovante has so far provided only a dubious basis for an ancillary restraint weakens its likelihood of success on the merits and weighs against granting injunctive relief.

**C. Biovante has not shown that it has a legitimate interest in the customers Wassenaar sold Biovante products to.**

At the TRO stage, the Court found "Biovante presented enough evidence to raise serious and difficult questions about its protected interest in customer goodwill," explaining:

> Wassenaar apparently benefited from Biovante's help as he built his business and customer base. Neither party has pointed to Missouri case law clearly delineating how much support—financial or otherwise—a company must give to a business partner to secure a protected interest in the business partner's customers. But Biovante has shown that it is close enough to the line to temporarily restrain Wassenaar from poaching its protected customer contacts while the Court engages in "more deliberate investigation."

Doc. [33] at 4, 6-7 (quoting *Dataphase*, 640 F.2d at 113). Based on new evidence and closer consideration of case law, the Court finds that Biovante is no longer "close enough to the line."

"'Customer contacts' has been defined as 'essentially the influence an employee acquires over his employer's customers through personal contact.'" *Healthcare Servs. of the Ozarks, Inc. v. Copeland*, 198 S.W.3d 604, 611 (Mo. 2006) (quoting S*chmersahl, Treloar & Co., P.C. v. McHugh*, 28 S.W.3d 345, 349 (Mo. Ct. App. 2000)). One protectable aspect of customer contacts is the customer's goodwill. *See, e.g., Osage Glass, Inc. v. Donovan*, 693 S.W.2d 71, 74 (Mo. 1985) ("Covenants against competition must serve a proper interest of the employer in

protecting the good will of a business . . . .") "The goodwill that develops results in sales of the company's product or services. Therefore, an employer has a protectable right in both customers and goodwill." *AEE-EMF, Inc. v. Passmore*, 906 S.W.2d 714, 720 (Mo. Ct. App. 1995).

When the company and salesperson are in a traditional employer-employee relationship, the question is easy. Missouri courts explain that the "goodwill that develops from customer contacts between the salesman or business partner and the company's customer is essential to the companies' success *and is the reason the employee or the business partner is remunerated*." *Id*. (emphasis added); *see also Naegele v. Biomedical Sys. Corp.*, 272 S.W.3d 385, 389 (Mo. Ct. App. 2008) ("[C]ustomer relationships are pursued and developed *at the employer's expense*, and add value to the employer's business. This is true regardless of whether the customer contact originated with the employer or the employee.") (emphasis added).

Wassenaar and Biovante did not have a standard employment relationship. Biovante and Wassenaar Ag Supply are separate corporate entities. Wassenaar was never an employee of Biovante, nor was he an independent contractor. The only contract between the parties was the "Agreement for Confidentiality" that Wassenaar signed so he could stay at the Branson meeting. Assuming the "Agreement for Confidentiality" could support an ancillary restraint of trade, the question remains: Does Biovante have a protectable interest in Wassenaar's customer contacts?

"[B]efore an employer can claim a protectable interest in customer contacts, an employer must first have a stock of customers who regularly deal with the employer." *JTL Consulting, L.L.C. v. Shanahan*, 190 S.W.3d 389, 398 (Mo. Ct. App. 2006) (citing *Kessler-Heasley Artificial Limb v. Kenney*, 90 S.W.3d 181, 186 (Mo. Ct. App.2002); *Empire Gas Corp. v. Graham*, 654 S.W.2d 329 (Mo. Ct. App. 1983)). Missouri courts have defined a customer as "someone who repeatedly has business dealings with a particular tradesman or business." *See id*. (citing *Empire Gas*, 654 S.W.2d at 330-31; *Kenney*, 90 S.W.3d at 186; *Silvers, Asher, Sher & McLaren, M.D.s Neurology, P.C. v. Batchu*, 16 S.W.3d 340, 345 (Mo. Ct. App. 2000)). "Unless the proponent of the restrictive covenant has a trade following, that is, a group of customers who regularly patronize the business of the particular employer, there can be no stock of customers and no protectible interest." *Steamatic of Kan. City, Inc. v. Rhea*, 763 S.W.2d 190, 192 (Mo. Ct. App. 1988).

Evidence presented at the preliminary injunction hearing showed that the disputed customers had business dealings with Wassenaar, not Biovante. In fact, Wassenaar did not even

regularly transact with Biovante. He ordered Biovante products from SGI under the Dealer Agreement. *See* Doc. [50-2] at 20. Mr. Masters testified at the preliminary injunction hearing that Wassenaar would buy Biovante products from SGI, pay SGI for the products, and then earn a commission based on the terms of his contract with SGI. Wassenaar submitted hundreds of invoices that Wassenaar Ag Supply sent to customers and dozens of checks from customers made out to Wassenaar Ag Supply. *See* Docs. [60-1]-[60-3]. And Mr. Wassenaar testified at the preliminary injunction hearing that he delivered the products to customers using his pickup truck and trailer. Biovante did not regularly interact with the customers.

It is telling that Biovante could identify only a "handful" of the customers Wassenaar sold Biovante products to. Mr. Masters testified in his deposition that "[w]e do not keep full records of our dealer's customers." Doc. [50-2] at 53. When asked if Biovante knew the total number of customers Wassenaar had, Mr. Masters responded, "We're only aware of what he tells us and what he has verbalized to us." *Id*. at 54-55. Wassenaar was not required to tell Biovante who his customers were. *Id*. at 55. Biovante did provide evidence that it gave Wassenaar some sales leads. Biovante did not provide an exact number of leads, but after reviewing the evidence Biovante presented at the hearing, the Court was able to identify eight. *See* Doc. [59] (evidence of leads found in Plaintiff's Exhibits 1, 2, and 5). Mr. Masters testified, however, that Wassenaar was not required to follow up on the leads, and Biovante would only know if Wassenaar sold to a lead if Wassenaar chose to report that to Biovante. *See* Doc. [50-2] at 56-57.

At least in the region where Wassenaar operates, Biovante does not have "a group of customers who regularly patronize [its] business." *Steamatic*, 763 S.W.2d at 192. Customers may have regularly bought Biovante products, but they bought them from Wassenaar or SGI, not Biovante. Biovante did not keep records of Wassenaar's customers, and it learned their identities only if Wassenaar shared them. The mere fact that a customer buys a company's product does not automatically give that company a protected interest in the customer contact.

The analysis would be different if Wassenaar were a Biovante employee. Even if Biovante had no prior sales presence in Minnesota, Biovante would have a protected interest in the customer relationships Wassenaar developed in that region because those relationships would have been "the reason the [Wassenaar was] remunerated." *AEE-EMF, Inc.*, 906 S.W.2d at 720. At the hearing, Mr. Masters testified that Biovante had never remunerated Wassenaar by salary or commission. He did claim to have established the commission schedule by which Wassenaar

was paid commissions by SGI. That may be true, but its legal significance is unclear. What is clear is that Biovante did not provide any evidence that it sold directly to Wassenaar's customers, that it ever paid Wassenaar by salary or commission, or that the parties ever entered into a contract under which Wassenaar was authorized or obligated to sell Biovante products.

Biovante argues that the other means of support it gave to Wassenaar are enough to create a legitimate interest in the customers. That support includes:

1. Wassenaar was listed on Biovante's website as a "dealer," which helped expose Wassenaar to potential customers. Biovante bore the expense of developing and maintaining the website.
2. Wassenaar represented Biovante at two trade shows—2022 and 2023 Commodity Classics—with at least some of his expenses paid by Biovante. Wassenaar gained some new customers at the trade shows Biovante subsidized. Wassenaar testified that he acquired two new customers from the Commodity Classics, and Biovante did not give a specific number.
3. Biovante provided Wassenaar with eight customer leads.
4. Wassenaar attended "Winter Workshops," where he learned about Biovante's products. Those events were open to the public.
5. Mr. Masters mentored Wassenaar throughout the time he sold Biovante products and shared product "recipes" to use with the customers.
6. Biovante provided Wassenaar with informational and promotional materials.
7. Biovante paid for Wassenaar's travel to attend the closed-door Branson meeting and shared allegedly confidential information at the meeting.

As noted in the TRO Order, Missouri law suggests that a company's protectable interest in its customers is tied to the expense that the company puts into cultivating the customer relationship. *See Naegele*, 272 S.W.3d at 389 ("[C]ustomer relationships are pursued and developed *at the employer's expense* . . . .") (emphasis added). Based on the more developed preliminary injunction record, Biovante's expenditures do not give it a fair chance of showing that it has a protectable interest in Wassenaar's customer contacts. Biovante has shown that it expended around $5000 in support of Wassenaar's business development, but Wassenaar has shown that he bore all other expenses. Biovante did not give Wassenaar any financing to start Wassenaar Ag Supply. *See* Doc. [50-2] at 59-60. Wassenaar paid for his own accounting software, the cell phone he used to call customers, and the postage to mail customer invoices. *Id.* at 59. He paid to keep the products in storage until they were delivered to customers. *Id.* at 60. He used his own truck and paid for the gas to conduct business and deliver Biovante products. *Id.* at 70. Wassenaar's commissions were paid by SGI, pursuant to his contract with SGI. *Id.* at

43-45. And Mr. Masters affirmed under oath that any risk of non-sale was allocated between Wassenaar and SGI pursuant to the same contract. Biovante assumed no such risk.

Biovante bears the burden of establishing a legitimate interest in the customer contacts and the need for injunctive relief. Biovante produced enough evidence at the TRO stage to carry that burden, but it has failed to rebut the new evidence provided by Wassenaar in response to the Motion for Preliminary Injunction. On review of that new evidence in light of Missouri law on restrictive covenants, the Court can no longer find that Biovante has a fair chance of prevailing on the customer contacts component of its breach of contract claim.

**D. Biovante did not substantiate its asserted interest in trade secrets.**

At the TRO stage, Biovante did not provide enough detail about the alleged trade secrets presented at the Branson meeting to allow the Court to decide if the information qualified for trade secret protection. The Court explained that "Biovante could have presented more evidence to rebut Wassenaar's claim that he never received any trade secret or confidential information at the 2022 meeting. To protect the confidentiality of the information, Biovante could have moved for leave to file it under seal." Doc. [33] at 8. Biovante did not remedy that shortcoming at the preliminary injunction stage. Biovante did provide new testimony from Mr. Masters, but that testimony still was not "sufficiently specific to allow a determination by the court." *Sigma-Aldrich Corp. v. Vikin*, 451 S.W.3d 767 (Mo. Ct. App. 2014). And Wassenaar also provided evidence challenging the trade secrets claim.

Biovante has now provided a few descriptions of the putative trade secrets presented at the Branson meeting. Mr. Masters's declaration with Biovante's TRO briefing states:

> I presented confidential information to the Biovante team in attendance, including Wassenaar. The confidential and business competition sensitive information I shared at the meeting including company plans and strategy for the development of proprietary microbial testing and data collection methodologies to be used in a proprietary analytical software tool based on a proprietary algorithm that was then in the early stages of development, as a strategy to improve product performance and customer service and satisfaction.

Doc. [28-1] at 2. Mr. Masters provided more details at his deposition and in his testimony at the preliminary injunction hearing. In particular, he testified that the meeting included a presentation about how Biovante was planning to start "specializing" rates and products using data collected over many years and new soil genomics testing offered by a company that came to the United States from Spain. Biovante revealed the number of species included in its products

for the first time during that presentation. And Biovante asked those in attendance at the meeting to collect more data and soil samples so Biovante's algorithm could be improved and perfected, allowing Biovante to deliver more specialized rates, recipes, and programs. When asked why he decided to show this information to the Branson attendees for the first time, Mr. Masters explained that he wanted to make sure that Biovante's team understood the value and importance of what was happening and that it was time to go to the next level.

In his deposition, Mr. Masters testified that the trade secrets Wassenaar was exposed to included "knowledge of biological information thus retaining to soil agronomy, soil biology that was given out through e-mails, phone conversations, as well as in this Branson meeting." Doc. [50-2] at 89. He also testified that Wassenaar had confidential information about the "[i]ndividual components of products, positioning against competitors, [and] sales tactics." *Id*. at 90. Biovante would take the data it collected over the years and use "an algorithm that computes for the end user thus making the sales rep or dealer or distributor jobs easier to sell." *Id*. at 91.

Missouri courts consider the following factors to determine whether information qualifies as a trade secret.

> (1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Healthcare Servs. of the Ozarks, Inc. v. Copeland*, 198 S.W.3d 604, 611 (Mo. 2006) (quoting *Cont'l Rsch. Corp. v. Scholz*, 595 S.W.2d 396, 400-01 (Mo. Ct. App. 1980). Considering those factors, Biovante has not shown that the information presented at the Branson meeting qualifies as trade secrets.[6] To begin with, it was and is known outside of Biovante. Mr. Masters acknowledged that employees of BioTech were at the Branson meeting where the alleged trade secrets were shared. Biovante's argument that the two companies were business partners at the

[6] Biovante's description of the trade secrets includes information that Mr. Masters shared with Wassenaar before he signed the "Agreement for Confidentiality" at the 2022 Branson meeting. Biovante has made no colorable argument that anything else it communicated to Wassenaar satisfies the factors for treatment as a trade secret. At the preliminary injunction hearing, Biovante's counsel acknowledged that the record was not developed on the information shared outside the Branson meeting. Therefore, the Court considers only the information communicated at the Branson meeting subject to the "Agreement for Confidentiality" for trade secret protection.

time does not change the fact that one of Biovante's chief competitors has the same information that Biovante claims is a trade secret. *See Vikin*, 451 S.W.3d at 775 (finding information was not a trade secret in part because the plaintiff's competitor had similar information).

Wassenaar also provided evidence that the information is known outside of Biovante, including a sworn declaration from Mr. Al Toops, an employee of BioTech, stating:

> The microbial testing and data collection methodologies presented at the August, 2022 meeting were not, and never were, proprietary to Biovante. The testing and data collection methodologies shared at that meeting were developed by me, not anyone employed by Biovante. I have never been a Biovante employee. I developed those methodologies over the course of my career. I shared those methodologies with Mr. Masters during a time when my employer, BTI Ag, LLC ("BTI"), was supplying Biovante with certain biological products.
>
> . . . .
>
> BTI and Biovante have not been doing business since mid-2023. BTI continues to perform and utilize the microbial testing and data collection methodologies I discussed at the August, 2022 meeting in Branson since then, and Regen Ag Labs continues to process these tests for BTI.

Doc. [48-28] at 2-3. Mr. Toops attached a draft of a presentation he claims to have prepared for the Branson meeting. *Id*. at 4-20. In his deposition, Mr. Masters acknowledged that Mr. Toops gave a presentation at the meeting but claimed, "I was the one that created every single slide that was shown at the meeting. It was my graphics, my coloring. I was the originator of every single slide, the text, the colors, the icons." Doc. [50-2] at 93. The substance of the presentation Mr. Toops attached to his declaration is similar to Mr. Masters's description of the confidential information presented at the Branson meeting. One slide discusses a "Planning Horizon" that includes gathering information from soil testing and implementation of a new program. Doc. [48-28] at 5. Several slides show a "Microbiome Analysis Report" prepared by "BECROP By BIOMEMAKERS."[7] *Id*. at 7. One of the slides appears to show the "Microbial Population" of

---

[7] The Court takes judicial notice of the fact that Biome Makers has connections to Spain. *See* Fed. R. Evid. 201(b) ("The court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."). Biome Makers' website shows that it has an office in Spain, and the company's founders, Adrián Ferrero and Dr. Alberto Acedo, are from Spain. *See Contact*, BIOME MAKERS, https://biomemakers.com/contact (last visited Mar. 13, 2024); *About*, BIOME MAKERS, https://biomemakers.com/about (last visited Mar. 13, 2024); *see also Smart Microbiome-Based Platform for the Early Detection of Biological Threats in Agriculture*, National Agricultural Library, U.S. DEP'T AGRIC., https://perma.cc/XH6C-UEQ6 (last visited Mar. 13, 2024) ("Biome Makers is an innovative biotech company founded in 2015 by two well-recognized Spanish entrepreneurs, based in both Spain (14

Biovante's BioRed product, including the total number of species and the fungal and bacterial "phylum distribution." *Id*. at 11. Mr. Toops's declaration and the attached PowerPoint presentation weaken Biovante's trade secret claim by suggesting that the alleged trade secrets are known by Biovante's primary competitor, BioTech. *See Vikin*, 451 S.W.3d at 775.

On the second factor, Biovante provided some evidence that it limited the extent to which the information presented at the Branson meeting was known *within* Biovante. Mr. Masters testified that the information was only shared with a select group of people in the Biovante organization. That does weigh in favor of trade secret protection, but its significance is qualified by Biovante's organizational structure. The Biovante "team members" at the Branson meeting were not all Biovante employees. At least one invitee, Mr. Wassenaar, ran a separate company and had no contractual agreement with Biovante before that conference. Mr. Masters also testified that two of the invitees were new recruits who had not yet started selling Biovante products.[8] Biovante did not provide enough information about the other participants to allow the Court to assess how closely protected the information was within the Biovante network. Mr. Masters did testify that it was not shared at Biovante's "Winter Workshops," to which more people were invited. But the fact that the company held less-exclusive meetings at which it did not impart certain information and did not require confidentiality agreements of the attendees does not mean that it treated everything presented at dealer meetings as a confidential trade secret. If evidence exists that the information was carefully guarded within the Biovante organization, it would presumably be in the possession of Biovante and readily producible by the company. The lack of such evidence is therefore a significant strike against Biovante's claims.

Third, Biovante did take some measures to protect the information presented at the meeting by having attendees sign the "Agreement for Confidentiality." But there is also evidence that some people in attendance—people associated with BTI and Mark Ma—did not sign the agreement. Mr. Toops declared:

> When I was at the August, 2022 meeting in Branson, a Biovante employee tried to get me to sign an agreement stating that I would keep Biovante's proprietary

---

employees) and U.S. (6 employees)."). And Mr. Toops's slide presentation suggests that the company is engaged in soil analysis along the lines that Mr. Masters described. Still, the Court does not have enough evidence to find that Biome Makers *is* the company Mr. Masters referenced in his hearing testimony.

[8] Mr. Masters stated that two such persons attended the Branson conference, but one left the second day, so only one heard the putative trade secrets. He did not suggest that the second recruit was not *invited* to stay, however, which is the salient point for evaluating how closely Biovante held the information.

> information confidential and would not work for any competitor of Biovante. I did not sign it. In fact, Chris Masters personally told me that I did not have to sign any Biovante confidentiality or noncompete agreement.

Doc. [48-28] ¶ 4. Other than the "Agreement for Confidentiality," Biovante did not provide evidence of measures it took to secure the alleged trade secrets, which again should be readily available to the company if it exists.

Fourth, Biovante did not provide evidence beyond general assertions about the value of the information to its competitors. In his deposition, Mr. Masters testified that the information would help Wassenaar and other Biovante sellers "give end users understanding of how our products differ, how the science is different, how they would choose Biovante products over a competitor." Doc. [50-2] at 91. But any claim that Mr. Wassenaar might use the putative trade secrets to provide an advantage to a competitor is hard to square with the evidence that employees of Biovante's chief competitor attended the same meeting, at least *heard* the same information, and may in fact have been the source of it.

Biovante also failed to make clear how Wassenaar could use the alleged trade secret information to compete with it. Mr. Masters repeatedly referred to an "algorithm," based on Biovante's years-long data collection effort, to generate specialized rates and programs for Biovante sellers to use with their customers. Such an algorithm could very well be a trade secret, but Biovante admits that Wassenaar cannot access or use any such algorithm. In his deposition, Mr. Masters testified:

> Q. So he can't use the algorithm right now to sell BTI products?
>
> A. Are you asking if Dusty can use the algorithm?
>
> Q. Yeah.
>
> A. I guess if he has his own algorithm, but as far as Biovante is concerned and the algorithm and the tools that we created as a company, no.

Doc. [50-2] at 96-97. The existence of the algorithm is not itself a trade secret; it has been referenced repeatedly in public court filings. If Wassenaar cannot deploy the algorithm, it is unclear how it could enable him to compete more effectively with Biovante.

On the fifth and sixth points, Biovante provided some evidence of effort expended to develop the information. Mr. Masters testified that the information was gathered over the course of years of data collection, testing, and experience. But he also testified that the information presented at the conference was about new soil genomics testing that would allow for more

specialized rates in the future. Biovante does not claim to have invested anything in the development of that testing. And Biovante does not claim to have an exclusive relationship with the testing company. So the new information presented could, at least in part, have been available to any company. *See Vikin*, 451 S.W.3d at 775 (no trade secret protection partly because "nothing prohibited a competitor from doing the 'legwork' again").

Without a more specific showing of what exactly Biovante claims is a trade secret and evidence of how Biovante has treated that information in particular, the Court cannot assess the merit of Biovante's arguments.[9] Biovante may be able to show that Wassenaar was exposed to trade secrets as the case progresses. But on the record before the Court right now, it failed to carry its burden.

**II. Biovante does not face an imminent threat of irreparable harm.**

"In order to demonstrate irreparable harm, a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." *Iowa Utils. Bd. v. FCC*, 109 F.3d 418, 425 (8th Cir. 1996). "It is well established that '[i]rreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages.'" *Grasso Enters., LLC v. Express Scripts, Inc.*, 809 F.3d 1033, 1040 (8th Cir. 2016) (alteration in original) (quoting *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009)). Under Missouri law, when a valid non-compete agreement is violated, courts generally find that an irreparable injury has been shown. *See, e.g.*, *N.I.S. Corp. v. Swindle*, 724 F.2d 707, 710 (8th Cir. 1984).

[9] At the preliminary injunction hearing, Biovante's counsel argued that it could have provided more evidence if the Court had allowed a longer preliminary injunction hearing or more time for discovery. That argument is meritless. Biovante chose when to bring this case. Biovante's relationship with Wassenaar ended in September of 2023, and the company waited until January of 2024 to file a case seeking immediate injunctive relief. Four months should have provided ample opportunity to gather the evidence it would need to justify such relief. Even if Biovante had somehow been unaware of the standard for injunctive relief before it filed its case, though, it then had the benefit of the TRO briefing, the TRO hearing, and this Court's TRO Order, to learn what it would take to meet that standard. And then it had *another four weeks* to marshal evidence. Biovante has the evidence most relevant to its trade secret claim—i.e., videos and slides from the Branson meeting—in its exclusive possession. At the preliminary injunction hearing, Biovante's counsel said that he did not submit the videos because the files are bigger than five gigabytes. Assuming that is true, it does not absolve Biovante of its evidentiary burden. Parties regularly provide large files to the Court. The Clerk's Office is available to advise litigants who encounter administrative obstacles to filing. Biovante's counsel is surely aware that the time to raise such an issue is not at the end of four hours of oral argument after four weeks of discovery and briefing of the motion to which the exhibit was plainly relevant. Biovante's failure to produce critical evidence cannot be blamed on any decision of this Court.

The finding that Biovante can no longer demonstrate a fair chance of prevailing on the merits is a good enough reason to find that Biovante does not face a threat of irreparable harm. But Wassenaar also submitted evidence showing that Biovante will not be irreparably harmed because no one is selling Biovante products in the region of Minnesota where Wassenaar works. Biovante granted SGI exclusive distribution rights in that region of Minnesota. The "Distributor Agreement" between Biovante and SGI provides:

> ***Exclusive Distribution***. Distributor has exclusive distribution rights for the territory(s) listed in EXHIBIT A only. Company agrees not to sell any products listed in EXHIBIT B ("Products") within said territory(s) either directly or indirectly to anyone other than Distributor without written consent of Distributor.

Doc. [48-24] § 1(b). In his deposition, Mr. Masters was asked:

> Q. So is it accurate to say that you're no longer selling in that 50-mile radius that was the subject of the Wassenaar/SGI dealer agreement?
>
> A. We are -- we are honoring and respecting the relationship as it sets right now until things are settled here through this legal process.
>
> Q. So you're not currently selling there?
>
> A. Myself, I'm not.
>
> Q. Biovante is not currently selling there?
>
> A. Not to my knowledge. I don't think so.
>
> Q. How about seed treatments, is it selling seed treatments in Mr. Wassenaar's area or what was formerly Mr. Wassenaar's area?
>
> A. To the best of my knowledge, we are not.
>
> Q. Is it selling foliar products in what was formerly Mr. Wassenaar's area?
>
> A. To the best of my knowledge, we are not.

Doc. [50-2] at 111. And Mr. Masters later clarified that Biovante was not being prevented from selling its products by a court order or injunction:

> Q. You're legally allowed to sell those products wherever you want, right?
>
> A. That's correct.
>
> Q. You're choosing not to?
>
> A. That's correct.

*Id*. at 112. Biovante's counsel confirmed at the hearing that the only entity that could sell Biovante products in Wassenaar's region of Minnesota is SGI. Therefore, the financial harm that Biovante will suffer without a preliminary injunction is, at best, speculative.

Biovante argues that it is not just losing out on sales, it is losing Biovante's protected interest in customer goodwill. For the reasons explained in the customer contacts discussion above, Biovante failed to substantiate its protected interest in those customers. But assuming Biovante has a legitimate interest in the customers' goodwill, that interest is at least weakened if not completely undermined by the fact the Biovante cannot or will not sell to those customers through October 25, 2024, when the Distributor Agreement with SGI expires.[10] *See* Doc. [48-24]. Accordingly, Biovante does not face a threat of imminent irreparable harm in the absence of an injunction.

**III. <u>The balance of harms and public interest factors favor Wassenaar</u>.**

The balance of harms and the public interest have also tipped in Wassenaar's favor. Missouri law protects a company's legitimate interests in customer contacts. Because the Court no longer finds that Biovante has a protectable interest in the customer contacts, enforcing the restrictive covenant would unfairly restrain trade and be contrary to public policy. And because Biovante no longer faces a threat of irreparable harm, the balance of harms now favors Wassenaar, who is certain to lose substantial income if enjoined.

## CONCLUSION

Biovante demonstrated a fair chance of prevailing on its breach of contract claim at the TRO stage, but the Court must reevaluate the evidence at each stage of the case. On the record before the Court at this time, Biovante has failed to show that it is entitled to a preliminary injunction. Biovante does not face an imminent threat of irreparable harm, and it has not shown a fair chance of prevailing on its breach of contract claim.

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff's Motion for Preliminary Injunction, Doc. [46], is **DENIED**.

Dated this 13th day of March, 2024.

SARAH E. PITLYK
UNITED STATES DISTRICT JUDGE

[10] The agreement is "effective as of October 25, 2022," for "a two (2) year term." Doc. [48-24].